F. L. ARTHAUD et al., Appellants, v. FARMERS & MERCHANTS STATE BANK, Appellee.

**BILLS AND NOTES:** Collateral Holder—Duty to Indorse Payments. An arrangement between the maker and payee of past-due promissory notes, under which the maker, for the sole purpose of securing for himself an extension of time, and of furnishing the payee with collateral with which to raise money by a new loan, executes new and independent notes, with an agreement that, when the new notes are paid, the amount thereof shall be indorsed as a payment on said original past-due notes, is not binding on a nonconsenting collateral holder of said original notes, except in so far as said collateral holder receives the proceeds of said loan, with knowledge of the source thereof. Especially is the collateral holder of such original notes bound to indorse thereon whatever amount he receives from such

loan with knowledge that it came from said loan, when such receiving is in full accord with the habitual course of dealing between the parties.

*Appeal from Washington District Court.*—JOHN F. TALBOTT, Judge.

JULY 6, 1920.

OPINION ON REHEARING MARCH 16, 1921.

SUIT in equity, to establish a credit of $2,000 on certain notes executed by plaintiffs as payers to Ed Klopfenstein as payee, which notes are held by the defendant as collateral security for an indebtedness owing by Klopfenstein to the defendant bank. There was a decree below dismissing the petition; also, rendering judgment against the plaintiff on a counterclaim for $1,000. The plaintiff has appealed.—*Modified and affirmed.*

*Eicher, Livingston & Eicher,* for appellants.

*W. H. Butterfield* and *Brookhart Bros.,* for appellee.

EVANS, C. J.—I. The notes involved in this controversy were executed by four joint makers. All business relating thereto, however, so far as it affects this controversy, was conducted by the plaintiff F. L. Arthaud alone. For convenience in discussion, we shall, therefore, refer to him as though he were sole plaintiff. The controlling facts in this case are comparatively few and simple, when once extricated from the complication and confusion of the collateral facts incidental thereto.

The notes upon which a credit is claimed by the plaintiff were executed in September, 1912. At that time, Arthaud executed and delivered to Ed Klopfenstein, as payee, a series of promissory notes falling due on successive dates, and amounting to a sum total of about $7,500. At the same time, and perhaps in the same transaction, he executed and delivered to Dan Klopfenstein a series of notes of like amounts and of the same total. Ed and Dan Klopfenstein were brothers, residing at Washington, Iowa. Arthaud resided at Chillicothe, Missouri. We infer from

the record that they were old acquaintances. The last of these notes fell due December 15, 1915. Only the notes due to Ed are involved in the controversy. Partial payments had been made thereon from time to time, to a sum total of about $4,500 on the principal, so that $3,000 remained unpaid. This sum was represented by three notes, upon each of which the sum of $1,000 was due as principal. These notes are known in the record as "B," "C," and "D," and will be referred to as such. Notes C and D were drawn for $1,000 each. Note B was originally for $5,500, but had been reduced by partial payments to a balance due of $1,000. Arthaud was not able to pay these notes when they matured. In January, 1916, he came to Washington for a conference with Ed and Dan, for the purpose of making some arrangement for time. On January 28, 1916, he executed and delivered to Dan Klopfenstein his two notes for $1,000 and $2,000, respectively, secured by a first mortgage upon certain real estate. These notes are known in the record as "G" and "H," and will be so referred to. There was no consideration for these notes, except an agreement between the parties, which has become the root of the present controversy. The mutual purpose of the execution of these notes G and H was to enable Dan to use the same for the purpose of negotiating a loan for $3,000. The request for such a loan upon this security was submitted to the defendant bank through its assistant cashier, White, and was acceded to by White; and the loan was made to Dan upon his promissory note, secured by the notes G and H, and the mortgage executed by Arthaud to Dan. The agreement between Arthaud and Ed and Dan was that the proceeds of the loan to be made by the bank to Dan upon Arthaud's paper as collateral should be distributed between Ed and Dan, and that the amount thus received by each should be applied as a payment upon the past-due notes held by each of them against Arthaud. By this distribution of the proceeds, Dan was to retain $1,000 and apply the same upon the notes held by him against Arthaud, and Ed was to receive $2,000, and was to apply the same as partial payment upon the notes B, C, and D, owned by him. It was also agreed by Arthaud that the actual indorsement of these credits upon his past-due notes B, C, and D, might be deferred until he should actually pay to Dan his new

notes, G and H. In the distribution of the proceeds of the loan, the bank paid to Dan the sum of $1,000, for which, in due time, Arthaud received an appropriate credit. The remaining $2,000 of the proceeds of the loan was placed by the bank upon its books to the credit of Ed: that is to say, it was placed in his checking account. It will be seen that Ed received the $2,000 in question upon no other consideration than his agreement to apply the same upon the existing indebtedness owed by Arthaud to him. Arthaud never received credit therefor. As between Arthaud and Ed, there is no question made by anyone but that Arthaud is entitled to the credit. Ed admits it, and has never denied it. On February 3, 1917, Dan paid his $3,000 note to the bank, and thereby redeemed the Arthaud notes G and H, and thereafter held the same until February 16th, when they were fully paid by Arthaud.

The reason why Ed failed to give credit upon the notes B, C, and D was that they had all been previously pledged by him to the same bank, this defendant, as collateral security for his indebtedness to such bank. He was a stockholder and director of the bank, and was its debtor to the amount of over $8,000. The Arthaud notes, B, C, and D, were pledged by him as collateral for all his said indebtedness. Ed could not, therefore, apply the $2,000 of proceeds of the loan upon the notes B, C, and D, without first paying such proceeds to the bank, to be applied upon his own indebtedness. This latter he failed to do, except in part. Dan was not a debtor to the bank at the time of the transaction in question, nor was he jointly liable for Ed's indebtedness nor jointly interested in Ed's collateral, the notes B, C, and D.

The broad contention for appellant Arthaud is that the arrangement entered into between Arthaud and the Klopfensteins was made known fully to the bank, and that it assented thereto and was bound thereby. This contention involves a finding of fact upon rather indefinite and unsatisfactory evidence.

It does appear that the first discussion of their plan by Arthaud and the Klopfensteins was tentative, and dependent upon their obtaining the consent of the bank to make the proposed loan of $3,000. If the bank had declined to make such loan, the notes G and H and the mortgage would never have been

executed. They did go together to the bank, and did submit to Assistant Cashier White their proposition or request for a loan to Dan upon the proposed security, and did obtain his assent thereto. Arthaud testified that all the details of their agreement as to the disposition of the proceeds were stated to White. This is denied by White, his contention being that no question was submitted to him except that of making the loan. Ed and Dan corroborated Arthaud, to some extent; but their testimony, as well as that of Arthaud, is very indefinite and general in form. None of them purport to state any details of what was said. The immediate circumstances militate strongly against the contention of Arthaud at this point. He did not know, at that time, according to his testimony, that Ed had pledged the notes B, C, and D to the bank or to anybody else. It also appears without dispute that Assistant Cashier White did not know of that fact. He had been in the employ of the defendant only a few months at this time, and was not familiar with its detailed discounts. There was no occasion, therefore, for any discussion as to the disposition of proceeds. Indeed, such a discussion would manifestly militate against the loan, rather than as an inducement to it. Moreover, if it be true that such information was given to White at that time, there is no pretense that any agreement was made with White whereby he could control such disposition of proceeds, or whereby he could control the conduct of Ed in any manner.

Upon the evidence, therefore, we do not find that any such agreement was entered into with the defendant bank, whereby it could have controlled Ed in the disposition of the proceeds of the loan distributed to him in any other sense than that, as a creditor, it might have resorted to legal process for the purpose of seizing any assets which it could find. Ed was in failing circumstances, and became insolvent shortly thereafter. At the time of the distribution of such proceeds of the loan, however, when the $2,000 was placed to Ed's credit in his checking account, none of the notes representing his indebtedness to the bank were then actually due. The bank could not, therefore, charge off the notes against his checking account. Ed testified, it is true, that he told the bank officials, at the time these proceeds were distributed to him, that they were to be applied upon

his indebtedness.  It may be inferred from his testimony that he also told them that they were to be applied upon the collateral, B, C, and D.  But such information, if given by him, was immediately followed by the issuance of checks on the fund, in a large part for other purposes.  If, in connection with such information, he had issued his check to the bank for $2,000 in payment of his own indebtedness to the bank, we should have little trouble in charging the bank with knowledge of the source from which the credit came.

Under the evidence, as we find the weight of it to be, no liability of the bank arose to allow a credit upon the collateral, B, C, and D, except for such amount as was actually paid to it by Ed upon the indebtedness for which the collateral was pledged.

This brings us to the second alternative in the case.  Ed did deliver to the bank his check for $1,000 of this fund, and it was applied upon his indebtedness.  No credit was made upon the collateral.  It is contended, therefore, for Arthaud that he is at least entitled to a credit for this amount upon his notes B, C, and D.  As against this, the bank contends that Ed gave no instructions as to the application of this payment, and that it had, therefore, a right to apply it as it saw fit.  It did, in fact, apply it upon the indebtedness for which the collateral was held.  The source from which the money came was actually known to the bank.  It appears, also, that these collateral notes were pledged to the defendant bank in 1914, and that, since that time, several partial payments had been made thereon, amounting to a sum total of $4,500.  Each of these payments had been collected by Ed from Arthaud, and had been by him applied upon his debt, and by the bank credited both upon the debt and upon the collateral.  It appears from the testimony of the bank officers, as witnesses, in substance that Ed was authorized to make these collections, provided only that he applied the same upon his indebtedness to the bank.  His statement to the bank as to the source of the collection had always been credited, in making indorsements upon the collateral.  Inasmuch as this course of dealing had been established between them, and inasmuch as the bank knew the source of the fund with which payment was made, and necessarily knew that Arthaud, as payer

of the collateral, was *entitled* to the credit, we see no reason, in law or equity, why he should not receive it. It was in no manner misled by any want of knowledge. It has never changed its position to its disadvantage by reason of any failure of direction or demand by Ed at the time of the payment. To permit it now to hold the benefit of the payment, without applying it as a credit upon the collateral as the source from which it came, would be, in view of Ed's insolvency, to award to it a profit out of the transaction in just the measure of Arthaud's loss thereon.

We reach the conclusion that the plaintiff is entitled to a credit of $1,000 upon his notes, as of the date that payment by check was made by Ed, and that this is the full extent of relief to which plaintiff is entitled.

II.   It is made to appear that, before the beginning of this suit, Arthaud paid to the defendant bank the sum of $2,000 upon the notes B, C, and D. This was done under protest, and upon a stipulation between the parties that such payment should be without prejudice to the legal right of either party in the later litigation which was then in contemplation. The purpose of such payment was to obtain release of certain securities, without awaiting the outcome of this litigation. The result of such payment was to leave Arthaud indebted to the defendant bank for a balance due of $1,000, in the event that he should fail to establish his right to any credit; and on the other hand, if he did establish his right to a credit of $2,000, then the bank would have received from him an overpayment to the amount of $1,000, and would be liable for its return. The bank set up its counterclaim for $1,000 as a balance due. Inasmuch as we hold that the plaintiff is not entitled to a credit for $2,000, but is entitled to a credit of $1,000, this finding amounts to an offset as against the defendant's counterclaim, and to nothing more.

The decree entered below will be modified, as herein indicated. The case may be remanded for decree to the district court, or, upon motion of either party, a decree may be entered here. Each party will pay one half of the costs in this court.— *Modified and affirmed.*

STEVENS, ARTHUR, and FAVILLE, JJ., concur.